UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK     FOR ONLINE PUBLICATION ONLY

---------------------------------------------------------------- X
THEODORE RICHARDSON,                  :
                                      :
                    Plaintiff,        :       MEMORANDUM
                                      :       AND ORDER
        - against -                   :
                                      :       02 CV 3651 (JG)
THE CITY OF NEW YORK, SUZANNE         :
McDERMOTT, and UNDERCOVER #7404,      :
                                      :
                    Defendants.       :
---------------------------------------------------------------- X

A P P E A R A N C E S :

    JON L. NORINSBERG
        225 Broadway, Suite 2700
        New York, New York 10007
        Attorney for Plaintiff

    MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
        100 Church Street
        New York, New York 10007
    By:   Hillary A. Frommer
        Assistant Corporation Counsel
        Attorney for Defendants

JOHN GLEESON, United States District Judge:

        Theodore Richardson sued New York City Detective Suzanne McDermott and an unnamed undercover New York City police officer, identified as UC #7404, alleging that they falsely arrested him and knowingly forwarded fabricated evidence against him to prosecutors, thereby causing him to be deprived of his liberty until he was eventually acquitted by a jury. The defendants have moved for summary judgment on the ground, among others, that Richardson has failed to produce sufficient evidence from which a jury could reasonably conclude that he was

arrested and indicted without probable cause, and that, in any event, they are entitled to qualified immunity. The assigned Magistrate Judge, to whom I referred the motion for a report and recommendation, agreed with the defendants, and the plaintiff objected. For the reasons set forth below, I conclude the Magistrate Judge erred in holding that no genuine issues of material fact remain to be tried. Accordingly, the defendants' motion for summary judgment is, in large part, denied.[1] Jury selection and trial will occur on December 18, 2006 at 9:30 a.m. A pretrial conference will be held on December 1, 2006 at 11:00 a.m.

BACKGROUND

On the night of January 23, 2000, Detective McDermott and UC #7404 were part of a team working an undercover "buy and bust" operation. Before leaving the station house, the field team sergeant gave McDermott an amount of money with which UC #7404 was to purchase drugs, and McDermott made photocopies of the bills so they could later be identified. She then gave the money to UC #7404, and the team departed separately for the "set" of the operation, a bodega at the corner of Ferndale Avenue and Sutphin Boulevard in southeast Queens. McDermott was assigned as the arresting officer that night, and she, along with the field team sergeant, waited in an unmarked car a few blocks away while UC #7404 approached the store and attempted to make a buy. UC #7404 found two men on the corner, and she asked them if "anyone was working," Def. 56.1 Statement ¶ 29, that is, selling drugs.

According to the defendant officers, Richardson was there outside the bodega, and he responded to UC #7404's question by walking toward her with crack cocaine in his hand. UC

---

[1] As the caption shows, Richardson has also named the City of New York as a defendant pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). At a conference held September 5, 2005, the Magistrate Judge granted the City's motion to bifurcate both discovery and trial as to the plaintiff's *Monell* claims. This motion accordingly does not concern whether any unconstitutional custom or policy of the City caused Richardson any harm.

2

#7404 said that she wanted "two dimes," or twenty dollars' worth, and Richardson gave her two rocks of crack cocaine. She gave him a $20 bill from the money McDermott had furnished her and walked away. After reaching a safe distance, UC #7404 used a handheld radio to notify McDermott that she had made a "positive buy" from a male black, approximately six feet tall with long dread locks; she also gave a description of the suspect's clothing.

McDermott and her field sergeant immediately proceeded to the location of the buy; she estimates it took them about one minute to arrive there. Meanwhile, UC #7404 made a second radio transmission upon reaching her vehicle, repeating her previous description and adding that the suspect had gold teeth. McDermott approached Richardson, who fit that description, and placed him in handcuffs for her own safety. McDermott brought Richardson over to her vehicle to pat him down for weapons and then radioed for UC #7404 to return to the set to make an identification. UC #7404 drove by at about 15 miles per hour and, through her tinted windows, was able to confirm that it was Richardson who sold her the crack. She radioed that information to McDermott, who formally placed Richardson under arrest. A search of his person by McDermott resulted in the seizure of approximately $45 in cash, including two $20 bills. Moments later, while still at the scene, McDermott compared the two $20 bills found on Richardson to the photocopy of the buy money and determined that one of them was a match.

Richardson has a different version of these events. He claims he went to the corner store at Ferndale and Sutphin that night at around 1 a.m. -- admittedly in violation of the 11:00 p.m. curfew that was a condition of his parole -- to buy a few cans of soda for his wife, who was feeling ill. He paid for the soda with a $50 bill and received $47.03 in change, though he does not recall in what denominations. Richardson walked out of the store with the sodas, and

3

as he began to cross the street, two unmarked police cars pulled up quickly. Four police officers got out and approached him, Detective McDermott among them. She immediately put Richardson in handcuffs, threw him against the side of a car, and began asking, "Where are the drugs?" She also searched his person, but Richardson did not have any drugs on him. McDermott found only the $47 Richardson had just received in change from the store. Richardson maintains that he did not sell drugs to UC #7404 and did not receive any money from her.

UC #7404 and McDermott relayed their version of what happened to the Queens County District Attorney's office. The case was presented to a grand jury, resulting in Richardson's indictment for Criminal Sale of a Controlled Substance in the Third Degree. Richardson was also brought up on three charges that he violated the conditions of his parole: two dealt with the pending drug offense; the third, to which he pleaded guilty, charged that he violated his curfew the night he was arrested. He was sentenced on the curfew violation to the full remainder of his previous sentence, one year and eight days. As for the drug charge, Richardson was tried before a jury, and on February 5, 2001, he was acquitted and released. He thereupon brought this action.

DISCUSSION

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law governing the case identifies the facts that are material, and

"only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

It is well-settled that "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994). Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted); *see also, e.g.*, *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) ("[W]e ... view [the facts] in the light most favorable to, and draw inferences in favor of, the non-moving party ...." (internal quotation marks omitted)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 586-87 (quoting Fed. R. Civ. P. 56(e)).

Richardson seeks damages pursuant to 42 U.S.C. § 1983, claiming false arrest, malicious prosecution, malicious abuse of process, and denial of a fair trial in violation of the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States. Although his several claims are in some ways doctrinally distinct, they generally rest upon the following two assertions, which Richardson makes based on his personal knowledge: (1) he did not sell drugs to UC #7404 that night; and (2) he did not have any money from UC #7404 on his person when

5

McDermott arrested him and claimed to recover $20 in pre-recorded buy money. As Richardson points out, at this stage of the case, he is entitled to the assumption that a jury would believe his testimony to that effect and make all reasonable inferences in his favor. Though there are important nuances, particularly to the claim against McDermott, the primary questions on summary judgment are whether a jury could reasonably infer (1) that UC #7404's misidentification of Richardson was more likely than not deliberate and (2) that McDermott more likely than not fabricated the evidence that she found the pre-recorded buy money in Richardson's pocket.

A.    False Arrest

Richardson's first claim is that he was arrested without probable cause in violation of the Fourth Amendment. In making out a claim for damages upon such a violation under § 1983, Richardson bears the burden of proving by a preponderance of the evidence the elements of a state law claim for false arrest, that is, that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2003). The first three elements of this claim are not in dispute. As to the fourth element, the defendant officers were privileged to arrest Richardson if they had probable cause to believe he had committed a crime. If no rational juror could find an absence of probable cause based on the facts alleged by Richardson and the reasonable inferences that can be drawn in his favor from those facts, the defendants are entitled to summary judgment.

1. <u>UC # 7404</u>

The principal focus of Richardson's allegations of misconduct is not UC #7404, but McDermott. Still, UC #7404 is a named defendant, and implicit in Richardson's allegations is a claim that UC #7404 either did not purchase drugs at all or did so from someone other than Richardson. At the very least, by Richardson's account, once UC #7404 arrived at the scene of the arrest, she must have known immediately that McDermott had detained the wrong person, but she nonetheless falsely made a positive identification. Assuming Richardson's version is correct, all suspicion would have dissipated immediately had UC #7404 owned up that Richardson was the wrong man.

Thus, the crucial questions with respect to Richardson's false arrest claim against UC #7404 are (1) whether UC #7404 purchased drugs at all; and (2) whether, assuming Richardson, at least, had not sold her any drugs, a jury could reasonably infer that UC #7404 knew as much when she identified him at the show-up. Taking as fact that Richardson was not the seller but that UC #7404 identified him as such only minutes after she claims to have made a buy, it would not be unreasonable for a jury to conclude that no purchase was made and/or that the mistake was deliberate. Of course, neither would it be unreasonable for a jury to infer that even if Richardson is not proved to have been the real drug dealer, a purchase was made and he fit the general description of the seller and that UC #7404 made a mistake at the show-up. But at this stage, Richardson is entitled both to have his testimony believed and to have all reasonable inferences that can be drawn therefrom made in his favor. And if UC #7404 either fabricated a drug sale or knowingly made a false identification of Richardson as a seller, causing his arrest, then Richardson has a false arrest claim against her. Since no reasonably competent officer could

7

believe that it was lawful to identify Richardson falsely, qualified immunity is unavailable for UC #7404 at this summary judgment stage.

I respectfully disagree with the Magistrate Judge's reasoning that Richardson needs independent evidence corroborating his testimony that he did not sell drugs to UC #7404 in order to survive this motion. *See* Report and Recommendation at 18. Richardson's testimony is itself admissible evidence, and, as mentioned, he is entitled at this stage to an assumption that the jury will believe him. That is enough.

   2. McDermott

No jury could find that McDermott falsely arrested Richardson. It is undisputed that McDermott heard over the radio from UC #7404 that a male black, approximately 6'2" tall with dread locks, had sold crack to the undercover officer. Within one minute, McDermott proceeded to the location of the sale and saw Richardson, who fit that description and was wearing clothes like those described by the undercover officer.[2] McDermott detained Richardson, handcuffed him, patted him down, secured the scene, and directed UC #7404 to return to the scene to determine whether the person detained was in fact the seller. About three to five minutes later, the undercover officer positively identified Richardson. At that point, Richardson, who was admittedly already "seized" for Fourth Amendment purposes, was formally placed under arrest.[3]

McDermott did precisely what we expect police officers to do in those circumstances. She obviously had a reasonable suspicion that Richardson had been involved in a

---

[2] The dispute as to whether UC #7404's description also included gold teeth is immaterial.

[3] That these facts are undisputed is clear from defendants' Rule 56.1 Statement (¶¶ 35, 36, 37, 41, 43, 45, 52) and plaintiff's responses thereto.

drug sale, *see United States v. Sokolow*, 490 U.S. 1, 7 (1989) (requiring "some minimal level of justification"); she then conducted an investigative detention reasonably related in scope (both in terms of the force used and the duration) to its justification, *see Terry v. Ohio*, 392 U.S. 1, 13 (1968); and then upon receiving the identification that sealed her probable cause to arrest the plaintiff, she did just that.

Richardson offers no facts or even a factual theory to support an inference that McDermott ought to have known that UC #7404's identification was, as Richardson claims, false. Rather, McDermott was entitled to rely in arresting Richardson on what UC #7404 told her. *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) ("The false arrest claim was properly dismissed .... [because] [e]ven if Oggeri is assumed to have arrested Jocks, he had probable cause to do so. Unlike Tavernier, who knew of the valid defense according to Jocks, all that Oggeri had before him was the statement of a fellow police officer that he had been assaulted and Tavernier's obvious injuries.").

Richardson's theory of false arrest liability on McDermott's part is based solely on the claim that McDermott fabricated evidence, that is, she falsely asserted that she recovered pre-recorded buy money from Richardson. But this alleged fabrication of evidence did not violate the plaintiff's right to be free from false arrests. *See Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) ("The manufacture of false evidence, in and of itself, ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."). As the classic example goes, writing a false confession and locking it away in a drawer is no constitutional violation. *See id.*, citing *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir.1980) ("[W]e do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives

9

a person of a right secured by the Constitution and laws."). Rather, as will be discussed below, it was only in forwarding such evidence on to prosecutors and to the grand jury, thereby causing Richardson to be deprived of his liberty, that McDermott -- on Richardson's version of the facts -- may be liable for violating his rights. Under New York law, however, such a claim for damages flowing from post-arraignment confinement is beyond the scope of the false arrest cause of action, which covers only pre-arraignment deprivations of liberty. *See Broughton v. State*, 37 N.Y.2d 451, 459 (1975) ("Where a plaintiff successfully establishes liability for false imprisonment his damages will be measured only to the time of arraignment or indictment whichever occurs first.").

In sum, Richardson's false arrest claim against UC #7404 must be tried. McDermott, however, is entitled to summary judgment on that claim.

B.   Malicious Prosecution and the Remaining Post-arraignment Claims

To make out a claim for malicious prosecution, Richardson must prove "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino*, 331 F.3d at 72 (internal quotation marks omitted). The plaintiff must additionally show "a post-arraignment seizure for a § 1983 malicious prosecution claim; however, the requirements of attending criminal proceedings and obeying the conditions of bail suffice on that score." *Jocks*, 316 F.3d at 136. As with Richardson's claim for false arrest, the only element in dispute is whether the authorities had probable cause to proceed against him. Unlike with respect to the false arrest claim, however, the grand jury's indictment "creates a presumption of probable cause," which "may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or

to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Colon v. City of New York*, 60 N.Y.2d 78, 82-83 (1983). At the summary judgment stage, the element of malice usually turns on the probable cause inquiry, since the "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1996).

Taking Richardson's version of the facts as true, a jury could reasonably infer that UC #7404 knowingly misidentified him and that McDermott fabricated the evidence that Richardson was in possession of the pre-recorded buy money. It is undisputed that the defendants passed that evidence along to the Queens County District Attorney's office, and that as a result Richardson was indicted and prosecuted. Those facts make out a malicious prosecution claim against UC #7404, and that claim will be tried. Because the availability of qualified immunity will depend on the jury's factfindings (and specifically whether Richardson can prove a knowing false identification of him), summary judgment on that ground is denied as well.

As for McDermott, whether plaintiff's version of events establishes malicious prosecution, as opposed to a free-standing claim for fabrication of evidence or denial of a fair trial, is a matter of some doctrinal ambiguity. The principal case Richardson cites is *Ricciuti*, in which the Second Circuit explained as follows:

> Each of the defendants insists that so long as there was probable cause for Alfred Ricciuti's arrest -- independent of the allegedly fabricated evidence -- the fabrication of evidence is legally irrelevant. In essence, they argue that as long as the arrest complied with the Fourth Amendment, the Ricciutis can have no claim for post-arrest fabrication of evidence against them.

11

>This argument -- an ill-conceived attempt to erect a legal barricade to shield police officials from liability -- is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society. No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process ....
>
>When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

124 F.3d at 130; *see also Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) (Newman, J.) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."). That passage from *Ricciuti* appears to support Richardson's claim that McDermott's fabrication of evidence denied him a fair trial. And the court in *Ricciuti* appeared to treat such a claim as an independent constitutional tort; it went on to analyze a malicious prosecution claim separately by stating the traditional rule that probable cause is a complete defense. *See* 124 F.3d at 130-131. However, in *Jocks*, the Second Circuit seems to have steered the rationale of *Ricciuti* into the malicious prosecution cause of action. Indeed, *Jocks* characterized the above-quoted discussion from *Ricciuti* as a ruling on a malicious prosecution claim:

>[T]he trial court, in dismissing the malicious prosecution claim against Oggeri, rejected the argument that the fabrication of evidence is a civil

> rights violation. In so doing, the district court erred. We have held that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130. Oggeri asserts that *Ricciuti* only applies to false evidence created to justify an arrest without probable cause, but in *Ricciuti* we specifically held that the police had probable cause to arrest but nonetheless reversed the district court's grant of summary judgment on the malicious prosecution claim because there was proof that the officers had later manufactured false evidence. *Id.* at 128, 130.

316 F.3d at 138. *Jocks*, reading *Ricciuti*, thus stands for the proposition that on a malicious prosecution claim, if it can be proved that a law-enforcement officer fabricated material evidence against a suspect and forwarded it to prosecutors, causing the suspect to be deprived of his liberty, *see Ricciuti*, 124 F.3d at 130 (noting that recovery is limited to "the harm occasioned by" the fabrication), then not only is the presumption of probable cause overcome, but the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator. As discussed above, Richardson has put forward sufficient evidence from which a jury could reasonably conclude he is entitled to recover from McDermott under § 1983.[4]

A similar analysis applies to Richardson's claim for malicious abuse of process, an element of which is that the defendant had a "collateral purpose" in setting the judicial process

---

[4] Two important limitations on such a claim warrant emphasis: In order for a plaintiff to recover, the alleged fabrication must be both material, *i.e.*, "likely to influence a jury's decision," *Ricciuti*, 124 F.3d at 130, *and* "the legally cognizable" cause of the post-arrangement deprivation of liberty. *Zahrey*, 221 F.3d at 350. It is particularly critical to distinguish between an alleged fabrication that "precipitated the sequence of events that resulted in the deprivation of liberty" from other charges of fabrication of evidence. *Zahrey*, 221 F.3d at 350 n.5. As vile as any fabrication of evidence is, particularly when the offender is a law enforcement officer, it seem obvious that a defendant who achieves a favorable termination in a criminal case cannot properly be permitted to seek damages (and obtain a jury trial) simply by asserting, for example, that one of several (equally incriminating) alleged admissions in a post-arrest statement was not in fact made. The availability of a cause of action based solely on a claim of fabrication, without the materiality and causation requirements, would unduly deter prosecutors' exercise of discretion to dismiss or abandon cases for a broad array of reasons having nothing to do with the defendant's guilt or the claimed fabrication.

against the plaintiff. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir.1994) ("[A] malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."). The "collateral purpose" Richardson claims is that the defendants wished to avoid the embarrassment of letting the real drug dealer go free. The question of whether the defendants, assuming they fabricated testimony and/or evidence against Richardson, did so to protect their own reputations or instead because they believed Richardson actually to be a drug dealer, will be submitted to the jury.[5]

C.     Damages

The defendants' last argument is that Richardson cannot recover damages for the period of time in which he was incarcerated for his curfew violation, to which he pleaded guilty, on the theory that his guilty plea was an intervening act that severed the chain of causation between the defendants' alleged constitutional violations and the result of his confinement. I note initially that there appears to be a dispute as to how much "parole time" Richardson actually served: Richardson was not charged with parole violations until February 3, 2000, at which time his senior parole officer indicated that he was being held at Riker's Island on the drug charge in lieu of a $5000 bond. Norinsberg Declaration, Ex. G. The senior parole officer further recorded, in making the charges, that "Arresting Officer, Detective S. McDermott stated that she did not observe the sale to the undercover, however, she did recover the pre-recorded buy money." *Id.*

---

[5]     There may be no need to occupy the jury's time with the "collateral purpose" inquiry at trial. If Richardson prevails on both his malicious prosecution claim based on *Ricciuti* and *Jocks*, and his false arrest claim against UC #7404, then he can recover the full measure of damages he suffered without need of proving a collateral purpose.

The decision of the Administrative Law Judge who sentenced Richardson on the curfew violation, rendered March 29, 2000, purports to revoke his parole for the full remainder of his previous term, one year and eight days. However, a "Parole Jail Time Certificate" appears to reflect that Richardson only served from February 4, 2000 to August 25, 2000 "as a parole violator." Pl. Reply in Support of Obj. to R&R, Ex. B. It is undisputed that Richardson was released the day he was acquitted, February 5, 2001, one year and 13 days after he was arrested.

Thus, at least some of the time Richardson spent in jail after his arrest could not possibly be attributed to his curfew violation. In any event, the defendants' entire causation argument is flawed. Richardson contends that the pending drug charge against him was one of the crucial factors the parole officials took into account both in charging him with violations and in imposing the maximum sentence on a first-offense, two-hour curfew violation. In order to recover for whatever "parole time" he actually served, Richardson's burden at trial will be to prove that the defendants' constitutional violations more likely than not were the cause of his detention on the parole violation. It seems to me plain that the ALJ could very well have given Richardson the maximum because of the pending drug charge, or at least a jury could reasonably so conclude. The defendants' motion to limit Richardson's potential damages is accordingly denied.

CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted only as to Richardson's false arrest claim against McDermott. It is otherwise denied. The matter is set for jury selection and trial on December 18, 2006 at 9:30 a.m.; a pre-trial conference will be held on December 1, 2006 at 11:00 a.m.

So ordered.


John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
September 27, 2006